UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) Docket No. 3:22-cr-00171-SVN |
| ROBERTO ALICEA, | ) |
| Defendant. | ) |

MEMORANDUM ON BEHALF OF ROBERTO ALICEA
<u>IN AID OF SENTENCING</u>

Todd A. Bussert, Esquire
FROST BUSSERT LLC
350 Orange Street, Suite 100
New Haven, Connecticut 06511

DATE: August 22, 2023

### I. INTRODUCTION

The youngest of four children from the marital union of a substance abusing Los Solidos gang member and a drug-addicted mother, Roberto Alicea is a 31-year-old married father of five who comes before the Court for sentencing having already served more time in pretrial detention (one year, as of this writing) than he ever has in a single term of confinement. *See* PSR ¶119. Mr. Alicea's life is one of contrasts, responsibilities assumed at too young an age simply to survive measured against a lifetime of high-risk behaviors (*e.g.*, substance abuse, street racing, contact with the criminal justice system)—the latter an apparent byproduct of both wanting self-worth and persistent, untreated mental health struggles.

For the reasons set forth herein, we respectfully submit that a non-Guidelines sentence followed by a term of structured supervised release, with appropriate conditions, is sufficient but not greater than necessary to satisfy 18 U.S.C. § 3553(a)'s stated goals. Such a disposition is reasonable, sufficient and not greater than necessary to achieve the ends of retribution, incapacitation, deterrence and rehabilitation.[1]

### II. HISTORY AND CHARACTERISTICS/NATURE OF THE OFFENSE — 18 U.S.C. § 3553(a)(1), 18 U.S.C. § 3661[2]

The PSR's review of Mr. Alicea's childhood and upbringing illustrates the importance of understanding and weighing a defendant's history and characteristics.[3] Seeing Mr. Alicea's life

---

[1] *See United States v. Williams*, 65 F.3d 301, 309-10 (2d Cir. 1995) (Guidelines "do not displace the traditional role of a district judge in bringing common sense and compassion to the sentencing process").

[2] This section draws from letters and emails appended hereto as Exhibit 1.

[3] As Justice Kennedy observed, "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique case study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996); *see Mistretta v. United States*, 488 U.S. 361, 404 (1989). Indeed, more than a decade before *Booker*, the Court

*in toto* offers necessary context to choices he has made and actions he has taken, providing insight into the man who now comes before the Court.

For as much attention as parties to the system give to gang members and their impact on their communities, seldom, if ever, does that consideration extend into the individual's home, to the impact of their lifestyles on their loved ones. In Roberto's recounting of his upbringing, as confirmed by his uncle Roberto Gandolfo, a former DOC correctional officer, we see and begin to appreciate the ramifications.

Even in the best of circumstances, Roberto's life would not have been an easy one. Born with a deformity that left him both deaf in one ear and the subject of derision and bullying throughout childhood, Mr. Alicea is reminded of all that he has endured in that regard each time he looks in the mirror. *See* PSR ¶¶78, 86.

Of course, Roberto was not born into the best of circumstances. Far from it.

Roberto's parents did console him when classmates taunted and teased. They showed no interest, whatsoever, in what happened at school. *See* PSR ¶86. Mr. Alicea, Sr.'s life is one that centered not on his wife and children but on his illicit activities and outside interests. When his philandering became an issue within the home, Roberto's father's response was drug use (cocaine) and severe physical abuse. *Id.* ¶¶69, 72. Roberto's mother, in turn, began taking Percocet to cope, which contributed to her arrest and imprisonment. *Id.* ¶¶69-70.

To Roberto's added detriment during this important, formative period was having to live with his father and, consequently, witness firsthand the full extent of his father's then life. *See*

---

of Appeals emphasized that "contrary to widely held belief, the Sentencing Reform Act did not abolish consideration of the character of the defendant in sentencing. In fact … the Act clearly ordered that the characteristics of a defendant were to be a central consideration in the fashioning of a just sentence." *United States v. Merritt*, 988 F.2d 1298, 1307 (2d Cir.), *cert. denied*, 508 U.S. 961 (1993).

PSR ¶70.  Not surprisingly, Mr. Alicea, Sr. followed Roberto's mother into the legal system and, ultimately, the Department of Correction.  Outside forces prevented the social safety net from catching Roberto.  Instead, he found himself homeless, a condition that persisted for approximately two years.  Around this time, Roberto turned to alcohol and contemplated self-harm.  *Id.* ¶¶80, 83.

Consistent with what he shared with the Probation Office (PSR ¶74), through the enclosed letter Mr. Gandolfo summarizes what he observed as "Roberto's uncle/father figure":

> I have witnessed his tough relationship with his family and friends.  He was often bullied for his disability with his ear at a young age and his parents had an unstable relationship, which resulted in his father frequently expressing his aggression out on Roberto.  His father is also affiliated with the (SRG) Los Solitos Gang, which adds to the negative environment he has been surrounded with.  This abusive household resulted in Roberto ending up homeless and left no choice but to care for himself at a very young age.  I have helped Roberto multiple times within his struggles, but it often led to him wanting to deal with them on his own since he is very independent.  He has always demonstrated an unwavering sense of loyalty and honesty which is a testament to his strong character.  He always did care for himself with little to no help from his parents, even when living with them.  Since he did not have the support from his parents, he ended up dropping out of school and starting work around the age of 13.  At a very young age, he had to learn to work for what he wanted on his own.  Roberto has helped me work on my own personal cars with bodywork and I can say his work ethic is like no other.  When he has his mind on a job, he puts his all into it and will not stop until it is finished.  His determination truly sets him apart from others.

What seems fairly clear about Mr. Alicea's history is that, notwithstanding a level of emotional instability/immaturity reflected in prioritizing partying and street racing, he boasts an exceptional work ethic born from necessity, namely the need to provide for himself.  It is the rare defendant who can boast self-sustaining, legal gainful employment (auto body work) dating back to their teenage years.  Yet, despite lacking meaningful paternal guidance or care, Mr. Alicea has created a life, albeit an imperfect one.

There is little dispute that Mr. Alicea's offense conduct represents a means of income. *See* PSR ¶130. That, in fact, may be one of the more unfortunate aspects of the choices Mr. Alicea made here because it does not seem that he required the money; he possesses the capacity and wherewithal to support himself and his loved ones. We trust, however, that it is not lost on the Court that during the relevant time period Mr. Alicea was slipping deeper into depression and drug use. *Id.* ¶¶80-81, 83. Mr. Alicea's wife Keyzerleen offers: "when I met Roberto 2 years ago he was goin thru a difficult time in his life he was sleeping in his car a lot of times had no one to give him a hand and expressed and told me a lot of how his child hood has affected him in many ways growing up." Said differently, at the time of the instant arrest, Mr. Alicea's life was spiraling out of control, and he found himself on the precipice of the proverbial abyss.

According to Mr. Gandolfo, "Comparing his mindset today, as compared to the time of his arrest and detention in August 2022, I can just tell he has grown mentally, taking full accountability for his actions and just wants a better future for himself and his family." Keyzerleen concurs: "being in jail has thought him that that's not a place he will want to ever return so he wants to do things right .he wants to be a better man and human being for himself our family and society. During this past year he has shown and expressed remorse of the crime he committed and has also acknowledged that what he did was wrong."

### III. AVAILABLE SENTENCES — § 3553(a)(3)

Imprisonment is not statutorily required here. *See* PSR ¶104 (probation eligible). That said, Mr. Alicea recognizes that he is subject to an additional term of imprisonment beyond time served.

### IV.  THE SENTENCING RANGE ESTABLISHED — § 3553(a)(3)

Consistent with the terms of the parties' agreement, Mr. Alicea's guideline range is 57-71 months' imprisonment.  *See* PSR ¶94.

A guideline range, of course, is an "initial benchmark" lacking the force of law, a starting point to be consulted but ultimately no more than one of numerous factors to be weighed when selecting a disposition that is sufficient but not greater than necessary to satisfy the purposes and goals set forth in 18 U.S.C. § 3553(a).[4]  The primary objective for this, as any, sentencing is parsimony, "an individualized assessment based on the facts presented."[5]

Where the record supports imposition of a below Guidelines sentence based on § 3553 considerations, before turning to those Mr. Alicea respectfully addresses mitigating factors that would warrant relief under the traditional Guidelines model.  *See* Doc. 171-2.

**A)**     **Post-Offense Rehabilitation**

Consistent with the terms of his plea agreement, Mr. Alicea receives a three-level, acceptance of responsibility reduction (§ 3E1.1) for his timely guilty plea, truthful admission of offense conduct and truthful disclosure of information to the Probation Office.  PSR ¶¶27, 41-42.  The plea is an admission of criminal conduct that, *inter alia*, avoids the government having to prepare for trial, or here even present evidence to a grand jury.  In this way, a § 3E1.1 reduction, "as everyone knows, was the Commission's limited authorization to sentencing judges to

---

[4]  *See Gall v. United States*, 552 U.S. at 49-50; *Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010); 18 U.S.C. § 3553(a)(4).

[5]  *Gall* at 50.

continue the age-old practice of affording a defendant some sentence reduction for pleading guilty."[6] Said differently, "[a]cceptance of responsibility is easily achieved."[7]

Mr. Alicea's rehabilitative efforts at Wyatt (PSR ¶6) not only distinguish from many defendants who appear before this Court, but they also demonstrate a "willingness to act to achieve rehabilitation, thereby benefiting the individual and society."[8] They show Mr. Alicea to be a man making "concrete gains toward 'turning his life around'," not in the way of "feign[ed] remorse" but as part of an effort toward post-offense rehabilitation by a "truly repentant defendant()" intent on "repair[ing] and rebuild[ing]" his life.[9] In sum, Mr. Alicea is the type of defendant who exhibits a higher degree of contrition than contemplated by § 3E1.1, the type of defendant who "may, in an appropriate case, [receive] a downward departure" (or, now, non-guideline sentence).[10]

### B)   Criminal History Overstates Seriousness

The Guidelines' Criminal History Category is a recidivist provision; it recommends increased penalties based on a defendant's prior involvement with the criminal justice system. More specifically, the Introduction to Chapter 4 of the Guidelines Manual provides:

> A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of

---

[6] *United States v. Maier*, 975 F.2d 944, 948 (2d Cir. 1992); *see United States v. Rodgers*, 972 F.2d 489, 493 (2d Cir. 1992) ("A defendant who pleads guilty is routinely afforded a two-point reduction for acceptance of responsibility…").

[7] *United States v. Core*, 125 F.3d 74, 78 (2d Cir. 1997), *cert. denied, Reyes v. United States*, 522 U.S. 1067 (1998).

[8] *United States v. Maier*, 975 F.2d at 948 (where guideline range was 51-63 months' imprisonment, affirming a sentence of four years' probation).

[9] *United States v. Sally*, 116 F.3d 76, 81 (3rd Cir. 1997).

[10] *United States v. Mickens*, 926 F.2d 1323, 1332 (2d Cir. 1991), *cert. denied*, 502 U.S. 1060 (1992); *see* U.S.S.G. Ch. 1, Pt.A 4(b), intro. comment; U.S.S.G. § 5K2.0(a)(3).

7

>criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence.

However, the Second Circuit has correctly recognized that recidivist provisions may recommend too long a punishment where a defendant's prior criminal involvement has not resulted in extended periods of incarceration.

>Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve.  **That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses.**  If, for example, a defendant twice served five or six years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen or twenty years.  **Conversely, if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect.**[11]

Where Mr. Alicea's longest prior term of confinement is approximately 11 months, we respectfully submit that a bottom of the range sentence (57 months) is longer than necessary to achieve the deterrent effect that the Guidelines contemplate.[12]

**C)    Family Circumstances**

In affirming *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991), the Court of Appeals recognized: "Among the permissible justifications for downward departure, we have held, is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties." *United States v. Milikowsky*, 65 F.3d 4, 7 (2d Cir. 1995).  Here, though Mr. Alicea has regrets about how decisions made in recent years have impacted his relationship with his children, he does care for and support them,

---

[11] *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001) (emphasis added); *see* U.S.S.G. § 4A1.3(b).

[12] Mr. Alicea's guideline range is the same as Mr. Bermudez's notwithstanding that Mr. Bermudez is unquestionably the more culpable of the two.  *See* Doc. 104 at 4.

and, as reflected below, empirical evidence indicates his absence serves to negatively impact their development. PSR ¶¶74, 76.

* * *

The above factors, independently or jointly, are sufficiently unique that even under the former mandatory Guidelines system, Mr. Alicea would merit a downward departure to a point where a term of imprisonment is not a necessary component of the sentence imposed.[13] Other considerations supporting a below Guidelines sentence are set forth herein.

## V.  NEED FOR SENTENCE IMPOSED — § 3553 (a)(2)

Having given due consideration to a defendant's history and characteristics and to the nature and circumstances of the offense, *supra*, the Court must, subject to the principle of parsimony, identify a sentence that reflects the seriousness of the offense, promotes respect for the law, provides a just punishment for the offense, affords adequate deterrence to criminal conduct, and protects the public from further crimes of the defendant, though "a particular purpose may apply differently, or even not at all, depending on the kind of sentence under consideration."[14] In other words, the task at-hand is to balance the goals of sentencing in determining a fair and appropriate disposition. In this regard, "[t]he sentence imposed should be no more severe than necessary to achieve the societal purposes for which it is authorized."[15]

---

[13]  See *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996), U.S.S.G. § 5K2.0.

[14]  *Tapia v. United States*, 564 U.S. 319 (2011); *see United States v. Crosby*, 397 F.3d 103, 112-14 (2d Cir. 2005).

[15]  ABA STANDARDS ON CRIMINAL JUSTICE, Sentencing 18-6.1(a), p. 219 (3rd ed. 1994); *see id.* 18-6.4(a), p. 227 ("A sentencing court should prefer sanctions not involving total confinement in the absence of affirmative reasons to the contrary."); *see* 28 U.S.C. § 994(j) ("Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense").

**A.     Retribution**

Retribution "reflects society's and the victim's interests in seeing that the offender is repaid for the hurt he caused."[16] The end "must be directly related to the personal culpability of the criminal offender."[17] Anything more is unnecessary, and therefore unwarranted.[18]

**B.     Incapacitation**

Incapacitation represents the intended end of removing serious and violent offenders from society (*i.e.*, isolating them) so as to protect public safety.[19] We would respectfully submit that, based on his overall institutional adjustment, this goal carries limited weight as it concerns the disposition of Mr. Alicea's case. *See* PSR ¶¶5-6; Exhibit 2 (evaluations/education records/ certificates). Moreover, it merits consideration that incarceration tends to have a deleterious effect on defendants since:

> [i]mprisonment … excludes offenders from economic and political participation, and loosens prisoners' relationships with families and communities. While prison may not necessarily function as a 'crime school,' it destroys many of the connections an offender ultimately needs to regain his place in society.[20]

---

[16] *Kennedy v. Louisiana*, 554 U.S. 407, 442, *as modified* (Oct. 1, 2008), *opinion modified on denial of reh'g*, 554 U.S. 945 (2008).

[17] *Graham v. Florida*, 560 U.S. 48, 71 (2010) (citation omitted), *as modified* (July 6, 2010).

[18] *Id.* ("A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense.").

[19] *See Ewing v. California*, 538 U.S. 11, 24 (2003).

[20] Nora V. Demleitner, *Smart Public Policy: Replacing Imprisonment with Targeted Nonprison Sentences and Collateral Sanctions* in A MORE PERFECT SYSTEM: TWENTY-FIVE YEARS OF GUIDELINES SENTENCING REFORM, 58 Stanford L.R. 1, 345 (2005) (citations omitted). According to a report by the National Institute of Corrections and the Community Corrections Collaborative Network, "research is clear that incapacitating people is unlikely to deter them from committing crimes in the future. In fact, research suggests that, for many, the experience of being in jail or prison will actually increase the likelihood that they will reoffend following their confinement." MYTHS & FACTS: WHY INCARCERATION IS NOT THE BEST WAY TO KEEP COMMUNITIES SAFE, p. 4 (2016).

With respect to incapacitation's impact on offenders and their families, we note research showing that when a parent is incarcerated, children suffer from social stigma and low self-esteem; are more likely to exhibit behavioral problems; are more likely to suffer with emotional and mental health issues; and are at an increased risk for diminished academic performance and truancy.[21]  Further, "most families experience financial losses as a result of parental incarceration."[22]  In sum and while not seeking to diminish the seriousness of Mr. Alicea's admitted misconduct, society is adversely impacted when parents are removed from families.

**C.     Deterrence**

"Generally speaking, […] legal and sociological scholars have raised serious questions about the power of any punishment to deter crimes."[23]  A large reason for the weakness of general deterrence theory is the "underlying assumption that people weigh rationally the consequences of their behavior."[24]  Indeed, studies have concluded that "correlations between sentence severity and crime rates […] were not sufficient to achieve statistical significance," and

---

[21] Arlene F. Lee, *Children of Inmates: What Happens to These Unintended Victims*, CORRECTIONS TODAY (June 2005) (available at http://www.allbusiness.com/human-resources/careers/937286-1.html); *see* Markph Murray, David P. Farrington, Ivana Sekol, Rikke F. Olsen, EFFECTS OF PARENTAL IMPRISONMENT ON CHILD ANTISOCIAL BEHAVIOUR AND MENTAL HEALTH: A SYSTEMATIC REVIEW 57 (Campbell Systems 2009) ("parental imprisonment is quite a strong risk factor for both child antisocial behavior and mental health problems").

[22] Creasie Finney Hairston, Ph.D., *Prisoners and Families: Parenting Issues During Incarceration*, from U.S. Department of Health & Human Services Conference FROM PRISON TO HOME (2001) (available at http://aspe.hhs.gov/ hsp/prison2home02/Hairston).

[23] Kittrie, et al., SENTENCING, SANCTIONS AND CORRECTIONS: FEDERAL AND STATE LAW, POLICY, AND PRACTICE, 29 (2d ed. 2002) (citation omitted).

[24] Arthur W. Campbell, LAW OF SENTENCING, § 2:2 (2d ed. 1991) (citations omitted); *cf. United States v. Cavera*, 550 F.3d at 196 (obligation to make individualized evaluation of "what is necessary for 'deterrence to criminal conduct' … almost inevitably makes judges focus on notions and theories that may be controversial to some", noting district courts role as "the primary gate-keepers of junk science").

that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."[25]

Respectfully, the more relevant consideration is specific deterrence, that is, Mr. Alicea's likelihood of recidivism, a factor that necessarily implicates incapacitation.[26]  Notable in this regard, Mr. Alcea is at an age where anecdotal and empirical evidence indicates individuals begin to age out of criminal behavior.  As reflected below, "[r]ecidivism rates decline relatively consistently as age increases."[27]

 

In terms of any claimed benefit that a term of imprisonment might have on Mr. Alicea's risk of recidivism, a study of over a study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time

---

[25] *See* Andrew von Hirsch et al., CRIMINAL DETERRENCE AND SENTENCE SEVERITY: AN ANALYSIS OF RECENT RESEARCH (Hart Publishing 1999); *see* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects.[…] . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

[26] *See, e.g.*, *Pepper v. United States*, 562 U.S. 476, 492 (2011) ("central factor that district courts must assess when imposing sentence"); USSC, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* at 14 n.55 (1987); U.S.S.G., Ch. 4, Pt. A intro. comment.

[27] USSC, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12 (2004).

frame."[28] According to "the best available evidence, […] prisons do not reduce recidivism more than noncustodial sanctions."[29]

**D.**     **Rehabilitation**

Where courts must consider the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D), imprisonment is not a proper vehicle by which to achieve rehabilitation.[30]

\* \* \*

Mr. Alicea's present situation reminds of then Attorney General Eric Holder's widely lauded speech to American Bar Association and the surrounding discussion about being 'smart on crime' that seemed to lose traction in the last Administration's prosecution priorities and approach to managing federal offenders: "[W]ith an outsized, unnecessarily large prison population, we need to ensure that incarceration is used to punish, deter, and rehabilitate – not merely to warehouse and forget. Today, a vicious cycle of poverty, criminality, and incarceration traps too many Americans and weakens too many communities. And many aspects of our criminal justice system may actually exacerbate these problems, rather than alleviate

---

[28] Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010); *see* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ("[t]here is no correlation between recidivism and guidelines' offense level.[…] While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism.").

[29] Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

[30] *See Tapia*, 564 U.S. at 330 ("Do not think about prison as a way to rehabilitate an offender."); *United States v. Anderson*, 15 F.3d 278, 282 (2d Cir. 1994) (discussing 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k)).

them."[31]  Respectfully, in a case such as this, a mitigated term of imprisonment followed by structed supervision overseen by the U.S. Probation Office is the type of approach that AG Holder envisioned.

## VI.     REQUESTED DISPOSITION

For the above reasons, as well as any others that the Court may find appropriate and just, Roberto Alicea respectfully submits that a **non-Guidelines sentence followed by a term of structured supervised release, with appropriate conditions** (*e.g.*, mental health and substance abuse treatment) is reasonable, sufficient and not greater than necessary to achieve the ends of retribution, incapacitation, deterrence and rehabilitation.  We further ask the Court include the following language in the judgment's Imprisonment section:

> The Court recommends the defendant be housed at a FCI Danbury (CT) for the purpose of facilitating regular visitation with his children and family in Connecticut.

Finally, we respectfully ask the Court waive any fines.

Respectfully submitted,

BY:   */s/ Todd Bussert*
Todd A. Bussert, CT24328
FROST BUSSERT LLC
350 Orange Street, Suite 100
New Haven, Connecticut 06511
(203) 495-9790; Fax: (203) 495-9795
tab@frostbussert.com

---

[31] *See* https://www.justice.gov/opa/speech/attorney-general-eric-holder-delivers-remarks-annual-meeting-american-bar-associations (emphasis added).

14

CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                              */s/ Todd Bussert*
                          Todd A. Bussert